# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARK KURTZMAN,                                          Case No. 1:09-cv-580

        Plaintiff,                                   Weber, J.
                                                        Bowman, M.J.

     v.

UNIVERSITY OF CINCINNATI, et al.,

        Defendants.


## REPORT AND RECOMMENDATION

Plaintiff Mark Kurtzman, DVM, filed suit against his former employer and two supervisors, alleging that Defendants acted in violation of the Family Medical Leave Act ("FMLA"), Plaintiff's First Amendment rights, and state law when they terminated his employment. (Doc. 3). Defendants filed a motion for summary judgment (Doc. 46), to which Plaintiff filed a response (Doc. 70), and Defendants, a reply (Doc. 74). Defendants' motion has been referred to the undersigned magistrate judge for initial review and a Report and Recommendation. *See* 28 U.S.C. §636(b)(1)(B). For the reasons that follow, I now recommend that Defendants' motion be granted.

### I. Background

Plaintiff is a veterinarian who was employed at the University of Cincinnati ("UC") from 2000 until his employment was terminated in September 2009. Plaintiff initiated suit on August 11, 2009 and filed an amended complaint on September 3, 2009. In his amended complaint (Doc. 3), Plaintiff alleges that UC and two former supervisors, Douglas Stone, DVM, and Sandra Degen, Ph.D., discriminated and retaliated against him in

violation of the FMLA. Plaintiff also alleges that the Defendants violated his First Amendment rights, in violation of 42 U.S.C. §1983. Last, Plaintiff alleges that Defendant Stone violated Ohio common law "by publishing false defamatory comments about Kurtzman," and that all three Defendants "terminated and/or placed him on administrative leave...in retaliation for consulting an attorney regarding...his employment." (Doc. 3 at ¶3).

While at UC, Plaintiff was employed within the Laboratory Animal Medical Service ("LAMS") department. LAMS provides care for animals used in research at UC, much of which research is conducted by the College of Medicine. Defendant Stone has served as the director of LAMS since February 2006. Defendant Degen is employed by UC in the Office of Research, and is Dr. Stone's supervisor. Plaintiff has named the two supervisors in their individual and official capacities. (Doc. 3 at ¶¶ 6, 7).

It is undisputed that Plaintiff and his direct supervisor, Dr. Stone, did not get along.[1] Plaintiff's complaint alleges that problems "seemed to start in December 2006" after Plaintiff expressed concerns about the conduct of another veterinarian employed by LAMS, Joe Matu, DVM. (Doc. 3 at ¶22). Another disagreement between Plaintiff and Defendant Stone, concerning the number of licenses needed from the Ohio Board of Pharmacy, escalated over a period of time and culminated in June 2007, when Plaintiff called a state regulator directly while Stone was still reviewing the issue. That disagreement resulted in a verbal reprimand memorialized by Stone in a memorandum dated June 15, 2008 (Doc. 46-2, Stone Affidavit at ¶¶ 6-7; Doc. 66-9 at 10-11). From November to December 2007, a third dispute arose when two LAMS veterinarian technicians were fired after they brought

---

[1] To the extent that factual disputes exist, the facts have been construed in favor of Plaintiff as the party opposing summary judgment.

their pet guinea pigs on site. Plaintiff disagreed with Dr. Stone's decision to fire the vet techs, believing the punishment to be overly harsh. (Doc. 3 at ¶23). A fourth significant dispute arose between the two men regarding the use of implantable microchips from a particular vendor, BMDS. Plaintiff disagreed with Stone's decision to purchase the product. Stone accused Plaintiff of not making a good faith effort to use the product and claimed that he inappropriately canceled a June 2008 meeting with the vendor.

For some period of time, Plaintiff appeared to have a better relationship with Stone's supervisor, Dr. Degen. Plaintiff contacted Dr. Degen in December 2007 to discuss his disagreement with the decision to terminate the vet techs. By email dated January 16, 2008 and in a meeting on January 25, 2008, Plaintiff again contacted Dr. Degen to discuss his concerns and disagreements with Dr. Stone's oversight of the LAMS department.

On January 28, 2008, Plaintiff began what became a six-week medical leave from work. (Doc. 3 at ¶24). Throughout the next few weeks, Plaintiff regularly telephoned the LAMS department to inform them of his continued illness, as well as of his difficulties in obtaining a diagnosis. Plaintiff returned to work on March 5, 2008. A week later, on March 12, Plaintiff informed Defendant Degen, via email, that he finally had been diagnosed with "Atypical Ulcerative Colitis." After his return to work, Plaintiff alleges that Defendant Stone met with Plaintiff and made the comment "How can I trust you when you take off work for so long?" (Doc. 3 at ¶26). Plaintiff then sent a second email to Dr. Degen on March 12, 2008 with the subject line reading, "Dr. Stone inappropriate behavior." The contents of the email referred to the prior "Guinea Pig incident" with the vet techs, but did not reference any alleged comments by Stone about Plaintiff's use of leave. (Doc. 44, Kurtzman Depo I, Exh. P). A third email from Plaintiff to Degen several hours later indicated Plaintiff's hope

that he and Stone had resolved their differences.  (*Id*.).

However, that was not the case.   After his return, Plaintiff alleges that Stone demoted him through a series of actions.   The alleged demotions took place over an eleven month period, but began in March 2008 immediately upon Plaintiff's return to work when Stone removed Plaintiff's "management responsibility" for locations other than the Medical Science Building ("MSB").  (Doc. 3 at ¶28).   Between April and June 2008, Plaintiff and Stone sat down for meetings with UC Human Resources Director, Theresa Murphy, in an unsuccessful attempt to resolve their ongoing disputes. In August 2008, Plaintiff alleges that Stone reduced Plaintiff's responsibilities for Vet Tech training, although Plaintiff's job title and salary remained unaffected at that time.  (Doc. 3 at ¶29).  In October 2008, Plaintiff alleges Defendant Stone falsely accused Plaintiff of cancelling a meeting with the BMDS vendor.

In early 2009, Plaintiff alleges that his job title was changed from associate director of LAMS, a title he had held since 2005, to senior veterinarian.   On February 3, 2009, Stone verbally reprimanded Plaintiff for inadequate veterinary care, concerning an incident Plaintiff disputes.  In mid-February 2009, Plaintiff again met with Dr. Degen to discuss his concerns.  In that meeting, Plaintiff complained of the handling of an incident involving Dr. Matu and a pig whose trachea was lacerated during what Plaintiff described as a negligent procedure.  (Doc. 3 at ¶35).  Plaintiff alleges that his complaints were met with further demotion, when Stone "removed all Vet Techs from Kurtzman's management responsibilities."  (Doc. 3 at ¶36).

Defendant Stone states that he intended to terminate Plaintiff's employment in April 2009, but did not notify Plaintiff of that fact before suffering a heart attack on April 23,

2009. Defendant Stone remained absent from the LAMS department from April 23, 2009 until July 20, 2009, during which time Dr. Debbie Kemper served as Interim Director of LAMS. Dr. Kemper expressed concerns about Plaintiff to Defendant Degen, including a May 2009 report that Plaintiff was copying records at Shriner's Hospital, even though a different veterinarian (Matu) was assigned to that facility at the time. On June 2, 2009, Degen met with Plaintiff for coffee, discussed several concerns including the records copying, and advised Plaintiff that he should begin to look elsewhere for a job if he could not continue working with supervisors at LAMS.

At some point in 2009, Plaintiff consulted with an attorney concerning his ongoing employment disputes. On July 26, 2009, Plaintiff's counsel wrote to Defendants, setting forth several complaints on Plaintiff's behalf. Dissatisfied with Defendants' response, Plaintiff initiated this lawsuit on August 11, 2009.

Defendants notified Plaintiff on August 27, 2009 that his employment was being terminated. Defendants also provided Plaintiff with a "draft" letter dated August 31, 2009 that stated that Plaintiff was being placed on "administrative leave" based upon four incidents: (1) cancellation of the meeting with a vendor; (2) improper contact with the Ohio Board of Pharmacy; (3) improper conduct in obtaining records from Shriner's Hospital; and (4) a lack of veterinary care. Defendants state that Plaintiff's termination for cause was finalized on or about September 11, 2009. Plaintiff alleges that all four reasons listed in the August letter, as well as any other reasons given for his termination, are pretextual. Plaintiff's amended complaint seeks compensatory damages, punitive damages, and injunctive relief, including reinstatement to his former position at UC, based upon Defendants' alleged violations of the FMLA and Plaintiff's First Amendment rights and state

law.

## II. Analysis

## A. Summary Judgment Standard

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir.2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat a motion for summary judgment, the non-moving

party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

Although reasonable inferences must be drawn in favor of the opposing party, *see Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, inferences are not to be drawn out of thin air. Rather, it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244-45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"*Matsushita,* 475 U.S. at 587, 106 S.Ct. 1356 (citation omitted). It is the Plaintiff's burden to point out record evidence to support his claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009)(citing *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

**B. Defendants' Motion**

**1. Uncontested Arguments In Favor of Judgment**

Defendants present three unopposed arguments in favor of summary judgment.

First, Defendants argue that UC is immune for money damages under any theory based upon the doctrine of sovereign immunity, as are the two individual Defendants sued in their "official" capacities. "In addition to the states themselves, the Eleventh Amendment immunizes departments and agencies of the states." *Dubuc v. Mich. Bd. of Law Examiners*, 342 F.3d 610, 615 (6th Cir. 2003)(citing *Pennhurst State Sch. & Hosp. v. Halerman*, 465 U.S. 89, 100 (1984)). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," i.e., against the State. *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008)(citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989)).

Defendants additionally argue that Degen and Stone cannot be held liable as individuals under the FMLA because neither can be considered to be Plaintiff's "employer." In a third uncontested argument, Defendants seek dismissal of Plaintiff's state law claims, including but not limited to a defamation claim, for lack of jurisdiction.

In his lengthy opposing memorandum,[2] Plaintiff fails to contest these three

---

[2] Local Rule 7.2(a)(3) states that memoranda "in support of or in opposition to any motion...should not exceed twenty (20) pages." In addition, the Civil Trial Procedures of the undersigned Magistrate Judge, available on the Court website, **require** parties to obtain leave of Court prior to filing any memorandum in excess of twenty pages. *See* Magistrate Judge Bowman Civil Trial Procedures, Section F, at 5. If a memoranda exceeds twenty pages, "counsel must include a combined table of contents and a succinct, clear and accurate summary, not to exceed five (5) pages, indicating the main sections of the memorandum, the principal arguments and citations to primary authority made in each section, as well as the pages on which each section and any sub-sections may be found." *See* Rule 7.2(a)(3). In this case, Defendants filed (without leave of court) a 50-page motion for summary judgment that included a 10-page combined table of contents, list of citations and summary. Plaintiff filed an 80-page responsive memorandum. Although Plaintiff sought leave of court to file his response out-of-time, the motion did not

arguments, all of which this Court finds to be meritorious.  *See generally Touvell v. Ohio Dept. of Mental Retardation and Dev. Dis.*, 422 F.3d 392, 400 (6th Cir. 2005)(holding that Eleventh Amendment bars private suit for money damages for alleged violation of self-care provision of FMLA); *Mitchell v. Chapman*, 343 F.3d 811, 829-832 (6th Cir. 2003)(public agency employee cannot be held liable in his or her individual capacity under the FMLA); *Higginbotham v. Ohio Dept. of Mental Health*, 412 F. Supp.2d 806, 813 (S.D. Ohio 2005)("The Sixth Circuit has determined that 'the FMLA does not impose individual liability on public agency employers.'...Thus, the individual Defendants are entitled to summary judgment on Plaintiff's FMLA claim.").  Here, neither side disputes that UC is an arm of the state.  Therefore, Defendant UC, as well as Defendants Stone and Degen in their official capacities, are immune from suit to the extent that Plaintiff seeks compensatory and punitive damages.  Defendants Degen and Stone are additionally entitled to judgment as a matter of law with respect to Plaintiff's FMLA claim against them as individuals, and Plaintiff's state law claims against all three Defendants should be dismissed without prejudice.  (*See* Doc. 70 at 80, Plaintiff's concession that state law claims should be dismissed).

### 2.  Contested Arguments on Plaintiff's FMLA Claims

#### a.    Claims Against UC for Reinstatement and Fees and the *Ex Parte Young* Doctrine

Although Plaintiff concedes in his response to Defendant's motion that UC is immune from suit for monetary damages (*see* Doc. 70 at 11), and that the FMLA does not support claims against his supervisors in their individual capacities, Plaintiff continues to

seek leave for the excess pages.

seek reinstatement and attorney's fees from the two individual Defendants, in their official capacities, under the doctrine expressed in *Ex parte Young*, 209 U.S. 123 (1908). Technically, Plaintiff seeks reinstatement and fees for both his FMLA and §1983 claims. However, the parties focus their arguments on the application of the doctrine to Plaintiff's FMLA claims. In keeping with the parties' arguments, this Court also will limit its discussion of the *Ex parte Young* doctrine to Plaintiff's FMLA claims, in part because Plaintiff's §1983 claims are subject to dismissal in their entirety on other grounds discussed below.

The *Ex parte Young* exception to sovereign immunity permits suit against state officials (but not the state itself) "for purely injunctive relief enjoining the official from violating federal law." *Ernst v. Rising*, 427 F.3d 351, 358-59 (6th Cir. 2005)(en banc). However, the exception to immunity does not extend to any retroactive relief. *S & M Brands v. Cooper*, 527 F.3d at 508. Thus, to determine whether the exception applies to a particular claim, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon v. Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)(quoting Justice O'Connor's concurring opinion in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)); *accord Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d at 616.

Defendants argue that they are entitled to judgment as a matter of law on the FMLA claims asserted by Plaintiff under the *Ex parte Young* doctrine, because the only case cited by Plaintiff is an unreported decision, *Holt v. State of Ohio Dept. of Youth Servs.*, 2006 LEXIS 69970 (S.D. Ohio, Sept. 27, 2006). Defendants assert that *Holt* is contrary to the

Sixth Circuit's published decision in *Mitchell v. Chapman, supra,* which held that FMLA claims could not be asserted against public agency supervisors.

*Holt* is not particularly persuasive to the extent that the limited FMLA discussion contained therein was dictum, and the *Ex parte Young* issue was not squarely presented. On the other hand, *Mitchell v. Chapman* held only that public agency employees cannot be held liable under the FMLA in their *individual* capacities.[3] *Id.,* 343 F.3d at 832. Thus, *Holt* is not contrary to *Mitchell v. Chapman,* because the latter did not address the issue of whether an individual supervisor can be held liable in his or her official capacity for prospective relief under the *Ex parte Young* doctrine. By its terms, *Ex parte Young* recognizes an exception to sovereign immunity - sometimes described as a legal "fiction"- that "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not 'the State' for sovereign-immunity purposes." *Virginia Office for Protection and Advocacy v. Stewart*, 131 S.Ct. 1632, 1638 (2011). In *Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002), the Sixth Circuit rejected an argument closely analogous to the one presented by Defendants here. *See id.* (holding that ADA claim for reinstatement of dismissed student to graduate program permissible under *Ex parte Young* doctrine).

Of course, another possibility exists for dismissal of Plaintiff's reinstatement claim, in that *Ex parte Young* does not apply where the federal law violation is no longer "ongoing"

---

[3] *Mitchell* involved a plaintiff's second attempt to sue his employer. In his first lawsuit, *Mitchell I*, the defendants were granted summary judgment based upon the court's determination that the plaintiff had failed to timely contact an EEO Counselor. In *Mitchell II*, the Sixth Circuit affirmed the district court's determination that the doctrine of claim preclusion barred Mitchell's claims against his supervisors in their *official* capacities, and also affirmed the lower court's decision that the defendants were entitled to summary judgment on Mitchell's *individual* capacity FMLA claims.

but requires a "continuing violation."  In other contexts, the termination of employment is not a "continuing" violation.  *See, e.g., Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618 (2007).  In an unpublished case, a district court in the Sixth Circuit dismissed an employee's claim for reinstatement under the FMLA, finding no "continuing violation" based upon the employee's termination.  *See, e.g., Diaz v. Mich. Dept. of Corrections*, Case No. 1:09-cv-1109, 2010 WL 5353583 (W.D. Mich., Dec. 21, 2010).  That court reasoned:

> [A]ddressing plaintiff's request for reinstatement would necessitate delving into the issue of whether defendants violated plaintiff's FMLA rights, whether there is a continuing violation, and whether reinstatement is appropriate.  If this Court cannot look back to make a determination on the substantive FMLA issue, it cannot decide, as a prospective matter, if the alleged violation continues.  The Eleventh Amendment therefore presents a jurisdictional bar as plaintiff cannot properly invoke the *Ex parte Young* exception to Eleventh Amendment sovereign immunity.

*Id.* at *5.  Nevertheless, in another unpublished case, a different court noted: "While it is debatable whether, in a strict sense, there is an 'ongoing' violation of federal law alleged here, courts have repeatedly held that, where the plaintiff..asserts a violation of federal law against a state official in conjunction with his disassociation from the state entity and also seeks reinstatement, the...reinstatement is 'prospective' relief."  *Dunn v. Spivey*, 2009 WL 1322600 at *4 (M.D. Tenn., May 11, 2009); *see also Gies v. Flack*, 495 F. Supp.2d 854 (S.D. Ohio 2007)(holding professor's claim for reinstatement was claim within *Ex parte Young* doctrine).

Although no court within the Sixth Circuit has yet issued a published decision on point, and the Sixth Circuit has yet to wade into this intellectual quagmire, the Fifth Circuit tackled the issue head on in *Nelson v. Univ. of Texas at Dallas*, 535 F.3d 318 (5th Cir. 2008).  There, the court reversed the dismissal of a claim for reinstatement under the

FMLA and held that reinstatement may be sought through *Ex parte Young*, based primarily upon the "great weight of case authority [that] clearly supports treating reinstatement as an acceptable form of prospective relief that may be sought through *Ex parte Young*," *id.* at 322, even while acknowledging that the countervailing argument was "not unreasonable." *id.* at 323.

As in the Fifth Circuit, a wealth of Sixth Circuit case law supports the conclusion that a claim for reinstatement falls within the *Ex parte Young* doctrine. *See, e.g., Whitfield v. Tennessee*, 639 F.3d 253, 257 (6th Cir. 2011)(reinstatement claim is considered permissible under *Ex parte Young*); *Carten v. Kent State Univ*., 282 F.3d 391, 396 (6th Cir. 2002)(ADA claim for reinstatement of dismissed student); *Thomson v. Harmony,* 65 F.3d 1314 (6th Cir. 1995)(reinstatement to research position with UC College of Medicine is permissible under *Young*); *Englar v. Davis*, 2011 WL 1429202 (E.D. Mich. April 14, 2011)(reinstatement states valid claim for prospective relief); *Powell v. Winn*, 2010 WL 280772 (M.D. Tenn., Jan. 19, 2010)(reinstatement to prior position states valid claim for prospective relief under FMLA); *Stewart v. Moccasin Bend Mental Hosp.*, 2009 WL 2244621 (E.D. Tenn., July 24, 2009)("plaintiff's ADA claim against state official for reinstatement to his job is not barred by the Eleventh Amendment."). *See also Cobb v. Alabama*, 2011 WL 3666696 (M.D. Ala., Aug. 22, 2011)(permitting reinstatement claim under FMLA, overruling R&R suggesting that *Ex parte Young* did not apply). Thus, I conclude that Plaintiff's claim for reinstatement under the FMLA, pleaded against the two individual Defendants in their official capacities, falls within the *Ex parte Young* exception

to sovereign immunity.[4]

### b. Two FMLA Theories:  Interference and Retaliation

Even if Plaintiff's claim for reinstatement falls within the *Young* exception, Defendants argue that Plaintiff's FMLA claims fail on the merits.  Plaintiff alleges FMLA liability under two separate theories:  that Defendants interfered with his FMLA rights, and that Defendants retaliated against Plaintiff for exercising his FMLA rights.

### i. Interference

In order to establish a prima facie "interference" claim under the FMLA, a plaintiff must establish that (1) he is an "eligible employee" under the Act; (2) Defendant is an "employer"; (3) the employee was entitled to leave under the Act; (4) the Plaintiff gave the defendant notice of his intention to claim leave; and (5) the defendant denied the plaintiff FMLA benefits to which he may have been entitled.  *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2003).  Defendants do not dispute the first three elements, but argue that Plaintiff cannot prove the fourth or fifth elements of an interference claim, because he never provided any notice of his intention to claim FMLA leave, and because Defendants never denied Plaintiff benefits.

Contrary to Defendants' assertion, an employee does not have to "expressly invoke the FMLA" in order to claim protection under the Act.  *See Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 723-24 (6th Cir. 2003).  Construing the record in Plaintiff's favor, by virtue of the fact that Plaintiff called his employer frequently during his absence with medical updates, Defendants were put on notice of Plaintiff's serious health condition.

---

[4]The individual Defendants in their official capacities are deemed to be "employers" under the FMLA.

Although Plaintiff was not scheduled to be off work for any particular period of time, he repeatedly gave notice that he was sick with a serious condition. (Doc. 44-4, Kurtzman Depo. at 117-119). A week after his return to work, on March 12, 3008, he emailed Degen with his diagnosis of "atypical ulcerative colitis." Plaintiff also points out that Stone signed Plaintiff's FMLA documents (Doc. 64, Stone Depo. I at 56-59). Under *Cavin,* verbal notice can be sufficient to apprise an employer that an employee suffers from a serious medical condition. When an absence relating to a medical condition qualifies under both an employer's paid sick leave policy and the FMLA, an employer may not elect to have the absence count solely as paid sick leave and then take adverse action against the employee in a ploy to evade the FMLA. *See Allen v. Butler County Comm'rs*, 331 Fed. Appx. 389, 396 (6th Cir. 2009); *see also Darboe v. Staples, Inc.*, 243 F. Supp.2d 5, 16-17 (S.D.N.Y. 2003).

Thus, Defendants are left with the argument that they never "interfered" with Plaintiff's FMLA rights. It is true that Defendants never denied Plaintiff any use of sick leave. However, preventing an employee from claiming FMLA leave is not the sole method by which a plaintiff can prove an "interference" claim. Rather, the Sixth Circuit has held that the fifth element of an interference claim merely requires the plaintiff to show that the defendant employer "somehow used the leave against [the employee] and in an unlawful manner, as provided in either the statute *or* regulations." *Wysong,* 503 F.3d at 447 (emphasis original, quoting *Bradley v. Mary Rutan Hosp.*, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004)).

Under the relevant regulations, a failure to restore an employee to "the same

position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment" constitutes a violation of the Act. 29 C.F.R. §825.214. Although the Defendants point out that a reassignment of duties without a change in pay or work hours generally does not constitute an adverse employment decision in the Sixth Circuit, the case law cited by Defendants for that proposition does not account for the more specific "terms and conditions" regulation under the FMLA. *Compare Kocsis v. Multi-Care Mgmt, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)(reassignment not materially adverse under ADA) *with Lee v. City of Columbus*, 2009 WL 2525143 (S.D. Ohio Aug. 13, 2009)(adverse employment action can include reassignment) and *Alston v. Sofa Express, Inc.*, 2007 WL 3071662 (S.D. Ohio, Oct. 19, 2007)(same, denying summary judgment for FMLA retaliation claim).

Here, Plaintiff alleges that he was "demoted" through reassignment of significant duties and therefore was not restored to "the same position" he had held prior to taking leave. Moreover, Plaintiff alleges that he was ultimately terminated as a result of his use of FMLA leave.

By definition, one might assume that an "interference" claim based upon a "right to reinstatement" must be considered at the point in time that the employee is returned to work. In this case, Plaintiff was not terminated until 18 months after taking leave and only one alleged "demotion" activity- Defendant Stone's placement of another veterinarian (Matu) in charge of a facility previously overseen by Plaintiff -occurred prior to Plaintiff's return to his same position and pay in March 2008. However, Plaintiff alleges that the day that Plaintiff returned to work, Stone verbally announced that he was demoting Plaintiff by removing his supervisory responsibilities for all facilities except for MSB. (Doc. 45-7 at

194-196). Plaintiff further alleges additional adverse actions taken by Stone over the course of the following year, leading up to and including Plaintiff's termination in August 2009.

In the Sixth Circuit, a claim alleging termination in retaliation for taking FMLA leave is cognizable under both the interference and retaliation theories, arguaby even when the termination occurred *after* the expiration of FMLA leave rather than during the period of protected leave. *See Wysong v. Dow Chem. Co.*, 503 F. 3d at 447 and n.2. Regardless of whether Plaintiff's allegations of demotion "by a thousand cuts" over the course of a year would be sufficient to prove an interference claim, his allegation that he was ultimately terminated a year later is at least theoretically sufficient to prove such a claim.[5] *See id.* at 447-448 (claim involved termination a year after plaintiff took FMLA leave). Therefore, Defendants are not entitled to summary judgment on Plaintiff's interference claim on the grounds asserted.

### ii Retaliation Claim

Defendants' argument that they are entitled to summary judgment on Plaintiff's retaliation claim fails for similar reasons. To prove liability under a retaliation theory, a plaintiff must show: (1) that he availed himself of a protected right under the FMLA; (2) that he was adversely affected by an employment decision; and (3) that there was a causal connection between the exercise of the FMLA right and the adverse action. *See Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir. 2001). Again, Defendants

---

[5]Defendants do not directly argue the timing of the alleged demotions as a defense to the interference claim. Aside from the ambiguity in the case law, this Court rarely, if ever, would find it appropriate to recommend summary judgment on a ground not fully briefed by the parties.

argue that because Plaintiff never sought or requested leave under the Act, he was never denied any such leave and cannot state an FMLA claim. Again, however, Plaintiff's periodic verbal notifications to his employer that his continued serious illness prevented his return to work is sufficient to overcome Defendant's motion for summary judgment based upon a failure to provide the requisite notice. Defendants do not dispute that Plaintiff periodically called in to advise them of his illness, and do not challenge the fact that Plaintiff suffered from a qualifying "serious medical condition." Apparently, Defendants never asked for any medical certification while Plaintiff was on leave in 2008 or at any other time. Even though Plaintiff did not specifically request FMLA leave, his request for sick leave amounted to a request for qualifying leave. Defendant's assertion that they never denied Plaintiff FMLA leave is irrelevant, because Plaintiff's claim is based upon alleged demotions and termination.

### c. Proof of Causal Connection

Whether the FMLA claim is brought under an interference or retaliation theory, Plaintiff must prove that his requested leave was "connected" to the adverse action. *See Arban v. West Publishing Corp.*, 345 F.3d 390, 402 (6th Cir. 2003). No interference claim will lie if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501,508 (6th Cir. 2006); *see also Harris v. Metropolitan Gov't of Nashville and Davidson County, Tenn.*, 594 F.3d 476, 483 (6th Cir.2010)(elimination of coach's supplemental pay during leave did not constitute interference). Likewise, if the defendant employer has a legitimate reason for terminating an employee unrelated to his exercise of FMLA protected leave, the plaintiff's

retaliation claim will not survive.

Plaintiff's primary evidence in support of causation is that Defendant Stone remarked to him, following his return back in March 2008, "How can I trust you when you take off work for so long?" (Doc. 3 at ¶26). Defendant Stone denies making the statement, but even assuming that he did, Defendants argue that they are still entitled to judgment because Plaintiff cannot show a causal connection between the claimed FMLA leave from January 28, 2008 to March 5, 2008 and Plaintiff's eventual termination in August 2009. Defendants contend that because the alleged statement was made more than a year prior to the termination, it is too remote in time to be connected with the adverse employment decision.

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for purposes of satisfying a prima facie case of retaliation. But when some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Plaintiff's evidence is indeed thin. However, despite the lack of temporal proximity between Plaintiff's termination and his use of FMLA-protected leave, if all the evidence offered by Plaintiff were to be credited by the fact-finder and Defendant's contrary evidence to be discredited, this Court cannot say that the evidence would be insufficient to support a prima facie case of retaliation. Not only did Stone allegedly make the "trust" statement with reference to Plaintiff's use of leave, but he shortly thereafter engaged in a course of conduct designed first to diminish Plaintiff's responsibilities and ultimately to terminate him. Plaintiff contends that none of the demotions or termination would have occurred but for

the original lack of "trust" connected with Plaintiff's use of FMLA-qualified leave. Theresa Murphy, UC's Human Resources Director, also testified that Stone was "angry" with Plaintiff and did not trust him. (Doc. 62, Murphy Depo at 17, 26-27, 45-46, 59-60).

If no additional protected conduct had occurred other than the "trust" statement, Plaintiff's proof in support of a prima facie case might well fall short of the mark. However, a critical piece of evidence for purposes of satisfying the "connection" element is the existence of a July 26, 2009 letter to Defendants from Plaintiff's attorney, outlining Plaintiff's FMLA allegations, just before Plaintiff's termination. Defendant Degen consulted with UC's counsel after receiving the letter.[6]    On August 11, 2009, Plaintiff filed this lawsuit, claiming violations of the FMLA. To the extent that Plaintiff can be viewed as exercising his FMLA rights by these actions, his termination shortly thereafter may constitute adverse action in close temporal proximity - and thus sufficiently "connected" -to the exercise of his rights to support a prima facie case on the element of causation. *See Turner v. Sullivan University Systems, Inc.*, 420 F. Supp.2d 773 (W.D. Ky. 2006)(letter from counsel protected activity, termination less than one month later presented issue of fact under FMLA). Although Defendants argue that a settlement demand letter from an attorney should not be classified as a protected activity for temporal proximity analysis, *see e.g., Jackson v. Baxter Intern, Inc.*, 2007 WL 4510258 (N.D. Ohio 2007) and *Lentz v. City*

---

[6]Defendants briefly argue that the fact that Degen had communicated with counsel after receiving a letter from Plaintiff's attorney, shortly before terminating Plaintiff, should not be considered by this Court. In support, Defendants cite an unpublished district court case from the Northern District of Ohio and a published case from the Eleventh Circuit. However, neither case involves employment discrimination and both are easily distinguishable. Although communications with counsel ordinarily are privileged, in cases involving employment discrimination and issues of pretext, communications with counsel are often considered, presumably under a theory of waiver. *See e.g., Hoffman v. Prof'l Med Team*, 394 F.3d 414, 419-420 (6th 2005)(considering consultation with counsel in context of FMLA and other employment discrimination claims); *Willis v. Hartzell Propeller Inc.*, 497 F. Supp.2d 913 (S.D. Ohio 2007).

*of Cleveland*, 410 F. Supp.2d 673, 693 n. 9 (N.D. Ohio 2006), the referenced letter in *Jackson* was not offered into evidence as counsel's letter has been in this case, and the brief footnote in *Lentz* simply noted that the plaintiff had failed to cite any case law.

Defendants also argue a lack of causation to the extent that Dr. Degen made the ultimate decision to terminate Plaintiff. Defendants assert that Plaintiff has failed to offer evidence that she was aware of the alleged "trust" statement by Stone in March 2008, or of any other discriminatory animus. Although Degen was well aware of the personal animus between the two men, Defendants argue that the termination was based upon Plaintiff's conduct throughout his course of employment, including when Stone was on medical leave, and Debbie Kemper was acting director of LAMS. However, Defendants also offer evidence that Stone himself originally made the decision to terminate Plaintiff in April 2009, and that Stone's termination decision was interrupted solely because of Stone's heart attack. (Doc. 46-2 at ¶¶28-31). While the issue is close, I conclude that a genuine issue of material fact exists for purposes of establishing the causation factor of Plaintiff's prima facie case.

### d. Pretext

By contrast, Defendants argument finds more purchase concerning the issue of pretext. A defendant's legitimate, nondiscriminatory reason for termination rebuts the presumption of discrimination created by a plaintiff's prima facie case, and invites summary judgment review of a plaintiff's burden to show pretext. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). On the facts presented, the alleged "trust" statement is barely sufficient to satisfy Plaintiff's prima facie case on the issue of causation,

and is wholly insufficient to show pretext. Plaintiff attempts to overcome Defendants' legitimate reasons for the termination, based on no more than his own subjective beliefs. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584-85 (6th Cir. 1992)(plaintiff's subjective belief insufficient to maintain claim of race discrimination). Instead, "a plaintiff can 'refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)(quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)(additional citation omitted).

In this case, Plaintiff first argues that Defendants' reasons for termination were factually false, insofar that some of the misconduct of which Defendants complain was misconstrued by Stone and/or by other supervisors, including Degen. However, an employer's nondiscriminatory reasons for termination will be upheld so long as the employer believed that the employee committed one or more terminable offenses, regardless of whether the employer's belief was mistaken. *See Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir. 1998); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988). Here, the evidence is irrefutable that Plaintiff and Defendant Stone had multiple disputes prior to the time that Plaintiff went on sick leave and continued to have disagreements throughout Plaintiff's employment at UC. Plaintiff's email to Defendant Degen on March 12, 2008, shortly after Plaintiff's return to work, stated that Defendant

Stone had threatened Plaintiff's job in relation to a dispute that began prior to the time Plaintiff went on leave- with no mention of any dispute concerning Plaintiff's use of sick leave. Although Plaintiff argues that he was continually "demoted" after his return to work in March 2008, during the same period of time, Plaintiff was offered a $3,000.00 raise in exchange for his first published research work. (Doc. 46-2, Stone Affidavit at ¶20). Stone began restructuring LAMS operations beginning in April 2008 after hiring a third veterinarian, and changes in Plaintiff's job duties are easily attributed to legitimate restructuring. (Doc. 46-2 at ¶¶18-19). After the restructuring, Plaintiff continued to be assigned to oversee operations at the largest and most important facility, the MSB. After Stone went on medical leave, Plaintiff had conflicts with the interim manager, Kemper. Thus, the evidence of the lengthy history of personal animus and disputes between Plaintiff and his supervisors, including Plaintiff's troubled history at LAMS both before and during Stone's absence, is sufficient to overcome any suggestion that the proffered reasons for Plaintiff's termination were factually false.

Plaintiff also fails to provide evidence to support the second type of pretext - where plaintiff asserts that discrimination is the most likely reason for the termination notwithstanding the existence of other grounds. A plaintiff attempting to prove this type of pretext "is required to produce additional evidence of discrimination beyond his prima facie evidence." *Burus v. Wellpoint Companies, Inc.*, 2010 WL 1253089 at *10 (E.D. Ky. March 25, 2010), *aff'd,* 2011 WL 3444311 (6th Cir., Aug. 8, 2011)(applauding district court's pretext analysis as "spot-on"). Plaintiff has failed to offer any such additional evidence in this case. Likewise, Plaintiff offers no evidence to prove the third type of pretext - that his overall course of conduct was insufficient to support termination.

Several pieces of undisputed evidence support Defendants' contention that Plaintiff was fired for legitimate business reasons. The final decision to terminate Plaintiff occurred months after a prior (unexecuted) decision to terminate him, and after one or two verbal warnings that put him on notice that the security of his tenure at UC was in jeopardy. Stone planned to terminate Plaintiff in April 2008 after a series of confrontations; although that termination did not occur, the conduct that preceded it was known to Degen, but the allegedly discriminatory "trust" comment was not made known to her. Plaintiff also complained to Degen (without any reference to FMLA) that Stone verbally threatened his job over at least one of the prior conflicts. Even if Stone's alleged "trust" comment is sufficient to prove a prima facie case- a conclusion that this Court has reached only by giving Plaintiff the most generous benefit of the doubt- Stone's comment is not sufficient to overcome Defendants' legitimate and nondiscriminatory reasons for the termination eighteen months later.

One of the main "demotions" of which Plaintiff complains leading up to termination, whereupon Plaintiff was reassigned to the MSB facility, was also supported by a strong business justification. Kemper continued to have difficulties with Plaintiff while Stone was on leave, even though there is no evidence that she had any knowledge of Stone's alleged "trust" statement or of any illicit retaliatory motives that he is alleged to have harbored. Kemper reported her significant difficulties in working with Plaintiff to her superior, Degen. In a meeting with Plaintiff on June 2, 2009, Degen advised Plaintiff that his behavior was inappropriate, and explicitly warned him that he should "start looking for a job elsewhere" if he could not work with his supervisors at LAMS. (Doc. 46-3 at ¶15). Degen's verbal warning and expressed concerns about Plaintiff's performance and continued tenure at

LAMS occurred nearly 8 weeks *prior* to Degen's receipt of any notice, through Plaintiff's counsel, that Plaintiff was alleging that some type of FMLA violation had occurred more than a year earlier.

On the facts presented, Plaintiff has put forth insufficient evidence to show that Defendants' stated reasons for his termination were not actual reasons for his termination, or that the reasons provided were insufficient to support termination. Plaintiff's sole evidence of discriminatory animus - and of pretext- is Stone's alleged "trust" statement - made 18 months prior to the termination. Given that the statement was made at a time so remote to the adverse employment action by Degen, by a different decision-maker, the statement is insufficient to overcome Defendants' evidence of its non-discriminatory reasons for the termination. *See, e.g., Burus v. Wellpoint Companies, Inc.*, 2010 WL 1253089 (statement made nearly two years prior to termination by person who did not make decision to terminate plaintiff insufficient to show that performance issues cited by employer were pretextual); *contrast Wharton v. Gorman-Rupp Co.*, 309 Fed. Appx. 990 at *8 (6th Cir. 2009)(close temporal proximity between attorney's letter and denial of full pay raise for poor performance sufficient to present pretext issue to jury, based on evidence that employer previously gave plaintiff full raises despite poor performance). Here, Plaintiff was repeatedly counseled about his conflicts with Stone and Kemper, and was explicitly warned by the decision-maker (Degen) that his job security was in issue before that decision-maker learned of any potential FMLA claim. Plaintiff offers evidence of no other employee with such a long and consistent pattern of problematic behaviors and conflicts with supervisors who was not fired. *See also Clark v. Walgreen Co.,* 424 Fed. Appx. 467,

474 (6th Cir. 2011)(plaintiff's evidence of pretext insufficient to overcome "great weight" of employer's evidence of legitimate basis for termination).

### 3. First Amendment Claim Under 42 U.S.C. §1983

In a federal claim entirely separate from his FMLA claims, Plaintiff alleges that Defendants violated his First Amendment rights, in contravention of 42 U.S.C. §1983.[7] Defendants correctly point out that Plaintiff cannot obtain monetary damages on this claim from Defendant UC or the two individual Defendants in their official capacities, based upon the doctrine of sovereign immunity previously discussed.

In addition, Defendants argue that they are entitled to summary judgment because all of Plaintiff's speech related to his job as a Veterinarian at UC LAMS, and an employee may not "constitutionalize" his workplace grievances. *See Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006), quoting *Connick v. Meyer*, 461 U.S. 138, 154 (1983). Defendants argue that Plaintiff's internal workplace disputes cannot be transformed by Plaintiff into a matter of public concern entitled to First Amendment protection. I agree.

After *Garcetti*, a public employee seeking to prevail on a free-speech retaliation claim must prove three elements: (1) that his or her speech concerned "matters of public concern;" (2) that the employee's interests outweighed the interests of the State employer; and (3) that the employee's speech was not made pursuant to his or her official duties. *Evans-Marshall v. Board of Education of the Tipp City Exempted Village School District*, 624 F.3d 332, 337-338 (6th Cir. 2010). "A First Amendment claimant must satisfy *each* of

---

[7]The enforcement scheme of the FMLA provides the exclusive means for remedying a violation of that Act; Section 1983 provides no remedy for violations of the FMLA. *See O'Hara v. Mt. Vernon Bd. of Educ.*, 16 F. Supp.2d 868, 895 (S.D. Ohio 1998).

these requirements."  *Id*. at 338 (emphasis added).

In this case, Defendants are entitled to summary judgment because Plaintiff cannot prove that the speech as to which he claims protection was made as a "private citizen" and not within the context of his official duties.  "Under *Garcetti*, 'even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties.'"  *Fox v. Traverse City Area Pub. Schools Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010), quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007)).

 "[T]he restriction by the defendants of such 'speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" *Ibarra v. Lexington-Fayette Urban County Govt.*, 240 Fed. Appx. 1 at *4, 2007 WL 579670 (6th Cir. 2007)(quoting *Garcetti*, 126 S. Ct. at 1960, holding that employee charged with responsibility of advocating for Hispanic community was barred from bringing retaliation claim for termination, based on comments made to public officials and newspapers regarding Hispanic advocacy issues).

"[I]n reviewing a public employee's statement under *Garcetti*, we must consider both its content and context- including to whom the statement was made - to determine whether the plaintiff made the statement pursuant to [his] individual duties."  *Fox*, 605 F.3d at 348 (citations omitted).  Thus, "[s]peech by a public employee made pursuant to ad hoc or de facto duties not appearing in any written job description is nevertheless not protected if it 'owes its existence to [the speaker's] professional responsibilities.'" *Id.* at 349 (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d at 544, additional quotation omitted).

In discovery responses, Plaintiff identified the following examples as speech entitled to First Amendment protection: (1) emails in December 2006 regarding another veterinarian's "missed treatments"; (2) a March 2008 proposal to contact the Ohio Board of Pharmacy regarding licensing issues at UC LAMS; (3) Plaintiff's contact with the USDA about glaucoma in rabbits; (4) a discussion with Defendant Degen in February 2009 about Plaintiff's concerns with a pig with a lacerated trachea; (5) the appropriate dose of Xylazine in animal protocols in February or March 2009; (6) a July 26, 2009 letter from Plaintiff's attorney to Defendants Stone and Degen; (7) the filing of this lawsuit in August 2009; and (8) the filing of Plaintiff's Amended Complaint in September 2009. In his deposition testimony, Plaintiff identified only counsel's letter and the filing of this lawsuit as protected speech for which he is seeking First Amendment protection. (Doc. 45-6, Kurtzman Deposition II, at 170-171).

In Plaintiff's position as a veterinarian, he was responsible for "animal care." To the extent that Plaintiff's First Amendment claim relies on the first five examples of speech referenced above, all occurred on his employer's time and in the context of his professional duties as a veterinarian. Reporting incidents to state or federal regulatory authorities was within the scope of Plaintiff's professional duties, and issues with drug dosing in animal protocols also relate to his duties. (Doc. 44-1, Kurtzman Deposition I at 41-45; *see also* Doc. 70 at 68, citing Degen testimony that all LAMS staff members have reporting duties).

The Sixth Circuit has noted the consistent trend of courts to hold that "'when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job.'" *Fox*, 605 F.3d at 350, quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008). In like contexts,

courts including but not limited to the Sixth Circuit have held that such claims are barred by *Garcetti*. *See, e.g., Evans-Marshall v. Bd. of Ed.*, 624 F.3d at 340 (contrasting speech by teacher in *Pickering* to public newspaper on his own time and in his own name, with plaintiff's speech to students during school hours); *Burgess v. Paducah Area Transit Authority*, 387 Fed. Appx. 538 (6th Cir. 2010)(bus driver's reports of mechanical problems falls within job responsibilities, where employee made statements at the workplace to management); *Garner v. City of Cuyahoga Falls*, 311 Fed. Appx. 896 (6th Cir. 2009)(noting that the fact that employee communicated only to superiors rather than to members of the public suggested that speech was "pursuant to" official duties; nature of speech "emanated directly from" official duties); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (park ranger's statements about morale and performance issues to outside consultant hired by department were made pursuant to duties); *Leslie v. Johnson*, 241 Fed. Appx. 30 (6th Cir. 2007)(*Garcetti* prohibits claim that state attorney was terminated for "whistleblowing" report of questionable loans to state authority, because speech was product of duties that required him to review loan practices); *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 365 (6th Cir. 2007)(police officer's memo to his superior officer expressing concern about financial cutbacks not protected, because memo conveyed "nothing more than 'the quintessential employee beef: management has acted incompetently.'" (citation omitted)); *See also generally Koucher v. Burd*, 274 Fed. Appx. 197 (3rd Cir. 2008)(rejecting state dog warden's argument that his speech regarding enforcement issues involved "much more" than official duties and included private concerns about dog laws, because plaintiff's conduct and speech concerned "matters related to his professional duties"); *Moor-*

*Jankowski v. Board of Trustees of New York University*, 1998 WL 474084 (S.D.N.Y. Aug. 10,1998)(no private right of action arising out of regulation prohibiting retaliation for reporting violations).

Plaintiff points out that soliciting a letter from his attorney to his employer,[8] and filing suit against his employer are not activities within the scope of his professional duties. The Defendants do not dispute that the filing of a lawsuit on Plaintiff's own time does not fall within Plaintiff's professional duties. Thus, this Court must determine whether a would-be plaintiff can claim protection for the *fact* of litigation-related speech, if the *substance* of the litigation-related speech otherwise would not be entitled to First Amendment protection.

The Sixth Circuit has yet to decide this issue, but I find the Second Circuit's opinion in *Ruotolo v. City of New York*, 514 F.3d 184, 189-90 (2nd Cir. 2008) to be persuasive. In that case, a police sergeant argued that he was retaliated against based upon a report he had prepared on environmental hazards in a police precinct in the Bronx. Eventually, the plaintiff filed suit over the alleged retaliatory conduct. The court first determined that the police officer's report was not entitled to First Amendment protection because it admittedly was written in the context of his professional duties as a police officer. The Second Circuit agreed with the district court that the officer's later action of subsequently filing a First Amendment retaliation lawsuit based on the original (non-protected) report did not *itself* amount to protected speech.

---

[8]Defendants argue that the letter from Plaintiff's counsel should not be considered speech by Plaintiff. However, this Court assumes for purposes of the pending motion that the letter is entitled to protection to the extent that it reflects speech that originated with Plaintiff (in communications with his attorney), in the same way that Plaintiff's civil complaint was "authored" by counsel but derived directly from Plaintiff's speech.

After *Garcetti*, for a lawsuit adequately to charge a First Amendment retaliation claim, the lawsuit must be predicated on speech made by the public employee as a citizen, and not pursuant to his or her official duties. To hold otherwise - that filing a lawsuit alleging retaliation for non-protected speech would give rise to a First Amendment complaint - would defy logic, allowing a plaintiff to bootstrap a non-actionable objection into a valid First Amendment claim.

*Ruotolo*, 514 F.3d at 187-188.

Plaintiff argues that three Sixth Circuit cases support his position that his speech was as a private citizen and not pursuant to his official duties under *Garcetti*. However, in the first case cited by Plaintiff, *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169 (6th Cir. 2008), the Defendants did not "advance any argument that Hughes's statements - either to the reporter or to her co-workers - were made pursuant to her official duties." *Id.* at 184. Therefore, the Sixth Circuit was not required to address the scope of *Garcetti* in that case, and it does not aid Plaintiff's position here.

In the second case, *Miller v. City of Canton*, 319 Fed. Appx. 411 (6th Cir. 2009), the police-officer plaintiff submitted a press release charging the Chief of Police with racial discrimination, abuse of position, and violation of departmental rules. The Sixth Circuit determined that *Garcetti* did not bar the officer's First Amendment claim based on retaliation from the press release because "Miller was not doing what he was 'employed to do' when he issued the press release." *Id.*, 319 Fed. Appx. at 417. In addition to being unpublished, *Miller* is distinguishable because the plaintiff there made a public statement, disseminated to a public news outlet, and not merely complaints to his superiors. In this case, despite the fact that a local newspaper published a story about Plaintiff's lawsuit shortly after it was filed, Plaintiff's speech was limited to complaints relating to his position

and directed to his superiors, and to third parties (regulatory authorities) to whom he had an official duty to report.

The last case on which Plaintiff relies is *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752 (6th Cir. 2010). In *Pucci*, the Sixth Circuit held that "a favorable reading of the record" indicated that the plaintiff's speech fell outside her assigned tasks as a deputy court administrator, and that her complaint to a State Court Administrative Officer about a particular judge's allegedly improper conduct from the bench was "extraordinary rather than everyday communication." *Id.* at 768. Again, in contrast to *Pucci*, here Plaintiff's complaints about animal care and other disagreements concerning specific incidents and his supervisor's handling of them more clearly fall within the ordinary scope of Plaintiff's duties as a LAMS veterinarian. *See Barachkov v. 41B Dist. Ct.*, 311 Fed. Appx. 863 (6th Cir. 2009)(holding that employee responses to interview inquiries by the SCAO were not protected, because speech was pursuant to employment responsibilities). In sum, although the Defendants' termination of Plaintiff for speech made pursuant to official duties might in this instance give rise to an FMLA claim, the same conduct is not violative of the First Amendment. *Accord, Weisbarth,* 499 F.3d at 546.

Having concluded that Plaintiff cannot show that his speech was made as a private citizen and outside the scope of his official duties under *Garcetti*, there is little need to address the other two elements of Plaintiff's First Amendment claim - whether the speech concerns a matter of "public concern" and whether application of the *Pickering*[9] balancing test favors the Plaintiff. Suffice it to say that other courts have found the "public concern"

---

[9] *See Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734 (1968).

test to be met when the speech concerns an agency's compliance with state and federal law. Defendants' characterization of Plaintiff's speech as limited to disputes with his supervisors ignores the fact that on summary judgment, disputed facts must be viewed in Plaintiff's favor. Here, a fact-finder could view Plaintiff's speech as including valid concerns about the Defendants' compliance with animal care laws and regulations. Defendants apparently concede that the *Pickering* test favors Plaintiff, as they make no argument concerning that element. Therefore, to the extent any discussion is necessary, this Court would hold that Plaintiff's speech related to a matter of public concern and that the balance of interests favors Plaintiff.

### 4. Qualified Immunity for Individual Defendants

As government officials sued in their individual capacities, Defendants alternatively argue that Defendants Degen and Stone are entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223 (2009). Even if the Court found otherwise on the First Amendment issue, Defendants Degen and Stone, in their individual capacities, would be entitled to judgment on this claim because Plaintiff cannot overcome their qualified immunity defense.

Under 42 U.S.C. § 1983, a public employee who is sued in his or her individual capacity can establish qualified immunity if it is shown that: (1) the parameters of the federal right at issue were not sufficiently clear at the time the defendant acted; or (2) it was not clear whether an exception to the interest asserted by plaintiff permitted the defendant's acts; or (3) even if contour of the asserted right was clearly delineated, it was objectively reasonable for the defendant to believe that his or her acts did not violate those

rights. *Barrett v. Harrington*, 130 F.3d 246, 264 n. 29 (6th Cir. 1997)(internal quotation marks and additional citations omitted). Defendants assert that it was reasonable for Degen and Stone to believe that their actions did not violate an established constitutional right. The Court agrees.

In order to allege a violation of a right, it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That is to say that "in the light of pre-existing law the unlawfulness must be apparent." *Id.*

For the reasons discussed and in light of *Garcetti*, Plaintiff cannot prove that either individual Defendant violated his clearly established First Amendment rights. *See, e.g. Ruotolo v. City of New York*, 514 F.3d 184 (holding that police officer's lawsuit sought to address personal grievances rather than a public purpose, which, under *Garcetti*, did not amount to a valid First Amendment retaliation claim). Accordingly, Defendants Degen and Stone are entitled to qualified immunity to the extent that they are named in their individual capacities.

### III. Conclusion and Recommendation

Based upon the discussion above, **IT IS RECOMMENDED THAT** the Defendants' motion for summary judgment (Doc. 46) be **GRANTED,** and that this case be **CLOSED** and stricken from the active docket of this Court.

       *s/ Stephanie K. Bowman*
       Stephanie K. Bowman
       United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MARK KURTZMAN,                                      Case No. 1:09-cv-580

        Plaintiff,                                  Weber, J.
                                     Bowman, M.J.

   v.

UNIVERSITY OF CINCINNATI, et al.,

        Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).