# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARK KURTZMAN,

                Plaintiff

    v.                        Case No. 1:09-cv-580-HJW

UNIVERSITY OF CINCINNATI, et al,

                Defendants

## <u>ORDER</u>

This matter is before the Court upon the defendants' "Motion for Summary Judgment" (doc. no. 46), which plaintiff opposes (doc. no. 70). The Magistrate Judge entered a Report and Recommendation (doc. no. 76), recommending that summary judgment be granted to the defendants on Counts One and Two, and that Counts Three and Four be dismissed for lack of jurisdiction. Plaintiff filed lengthy objections (doc. no. 82), and defendants responded (doc. no. 85). This Court held a hearing on April 25, 2012, at which counsel presented oral arguments. Upon *de novo* review, and having carefully considered the pleadings, briefs, exhibits, objections and oral arguments, the Court will <u>grant in part and deny in part</u> the motion for summary judgment. Specifically, the Court will <u>deny</u> summary judgment on Count One (the FMLA claim), <u>grant</u> summary judgment in the defendants' favor on Count Two (the First Amendment claim), and <u>dismiss</u> Counts Three and Four (the state law claims), for the following reasons:

## I.  Background and Procedural History

The underlying facts have been fully set forth by the Magistrate Judge (see

doc. no. 76 at 1-5), are incorporated herein, and need only be summarized.  In 2000, plaintiff began working as a veterinarian for the University of Cincinnati ("UC") at its Laboratory Animal Medical Service ("LAMS") department.  Plaintiff was named "Associate Director" of LAMS in 2005 by Director Bill Porter, D.V.M., and received a substantial pay raise.  Beginning in February of 2006, Dr. Douglas Stone, D.V.M., replaced Porter as director of LAMS and became plaintiff's supervisor.  Dr. Sandra Degen, Ph.D., Vice President of the Office of Research, was Dr. Stone's supervisor.  Plaintiff was an unclassified at-will employee of UC.  In subsequent years, two more staff veterinarians were hired at LAMS, Dr. Debbie Kemper and Dr. Joseph Matu.

Plaintiff became seriously ill and took extended sick leave in early 2008.  According to plaintiff, Dr. Stone suspected he was "faking" his illness, became increasingly hostile toward him, and retaliated against him in a variety of ways. Upon returning from leave, Dr. Stone significantly reduced plaintiff's supervisory responsibilities, and subsequently, plaintiff's employment was terminated.  Defendants contend that the two men simply did not get along and point to several incidents in 2007 that pre-date plaintiff's use of sick leave under the Family and Medical Leave Act ("FMLA").

For instance, in June 2007, Dr. Stone had asked plaintiff why UC had so many pharmacy licenses and told plaintiff he was going to review the issue (doc. no. 64 at 187, Stone Dep.).  Plaintiff, who had up to that time handled the licensing for LAMS, contacted the Ohio Board of Pharmacy ("OBP") and then sent an email to all "Vet Techs and Vets at UC" indicating that he had resolved the matter.  Dr. Stone

reprimanded him (doc. nos. 45-11, Letter of June 15, 2007). Dr. Stone believed that Dr. Kurtzman's efforts undermined him and were an attempt to justify the "status quo" (doc. no. 46-2 at ¶¶ 4-7, Stone Aff.). Dr. Stone thereafter changed the licenses from Dr. Kurtzman's name to his own name (doc. no. 65 at 53-54, Stone Dep.). Plaintiff did not contact the OPB again without Dr. Stone's prior approval.

Plaintiff's work performance evaluation, dated August 27, 2007, was positive and indicated ""Mark has tremendous clinical skills. He is knowledgeable about regulatory compliance and strives to prevent problems from arising. He is hard working" (doc. no. 60 at 51-52, Kurtzman Dep. discussing Exhibit 5 "Evaluation").

In late 2007, Dr. Stone fired two LAMS veterinarian technicians who had brought their pet guinea pigs to work. Dr. Stone fired them for violating policy and risking contamination at the LAMS facility. Plaintiff felt termination was too harsh. By email of January 16, 2008, and in a meeting on January 25, 2008, he discussed his concerns with Dr. Degen. Dr. Stone, who was angry that plaintiff did not support his decision, then assigned plaintiff the duty of training staff about "not bringing pets to work."

From January 28 until March 5, 2008, plaintiff became seriously ill and took approximately six weeks off from work. Plaintiff's illness was difficult to diagnose, although he had debilitating symptoms and lost nearly fifty pounds while sick. During this time, plaintiff repeatedly spoke with LAMS personnel and left telephone messages at the LAMS department advising that he was very ill, but did not have a definite diagnosis yet. When he was finally diagnosed with "Atypical Ulcerative

Colitis," he informed Dr. Degen via email on March 12, 2008.  The parties do not dispute that plaintiff had a serious medical condition, that he asserted the need for sick leave, and that he was given all the leave he requested.

Plaintiff alleges that, after he returned from his illness in March 2008, Dr. Stone met with him and complained "How can I trust you, you've been gone so long?" (doc. no. 45-1 at 6-8, Kurtzman Dep.).  Dr. Stone denies making this precise comment (Stone Aff. ¶ 15), but acknowledges that he was (in his own words) "puzzled" or "befuddled" by Dr. Kurtzman's illness and that he was skeptical of the plaintiff's messages about his tentative diagnosis (doc. no. 65, Stone Dep. at 116-118).[1] Several days after his return from leave, Dr. Stone "blew up" at plaintiff and  threatened to fire him.  Plaintiff complained of Dr. Stone's threats and behavior in this incident to the HR department (doc. no. 62 at 20-21, Murphy Dep., indicating that plaintiff was looking for "a better working relationship with Dr. Stone").   Dr. Stone later apologized for his behavior (Id. at 24).

Meanwhile, Dr. Stone decided to restructure LAMS and the work of Drs. Kurtzman, Kemper and Matu.  Dr. Stone assigned each one to a particular facility, indicating he wanted "clear lines of responsibility" (doc. no. 46-2 at 8, Stone Aff. ¶

---

[1]In his deposition, Dr. Stone referred to Ex. 34 where Sandy Rebholz indicates that Stone and others in LAMS thought that Kurtzman was faking his illness (doc. no. 65 at 116).  When asked if had conversations with Robert Anderson about this, Dr. Stone indicated that "We were puzzled by Kurtzman's calls about strange diagnoses" (Id. at 117).  In his affidavit, he acknowledges that he was "aware that employees had discussions about the mystery of Mark Kurtzman's illness" (doc. no. 46-2 at ¶ 13). Given the rumors that he was "faking" illness, plaintiff showed Dr. Stone medical documentation of  his illness upon his return.

19).  Plaintiff contends that, upon returning from leave, Dr. Stone demoted him by restricting him to a single facility, the Medical Sciences Building ("MSB"), and by removing his previous "management responsibility" for other facilities and personnel (doc. no. 60  at 9-10, Kurtzman Dep. explaining that "I was notified that I was no longer going to be in charge of everything and have Joe Matu or Deb Kemper underneath me").  Despite his reduced supervisory authority, plaintiff initially retained the same title and salary (doc. no. 45-1 at 1-5, Kurtzman Dep., discussing specific reduced responsibilities).  This reassignment of duties officially took effect on April 2, 2008, although the plaintiff was advised of it earlier (doc. no. 60  at 8-10, Kurtzman Dep.).

In April of 2008, Dr. Stone also decided to purchase from the vendor "BMDS" a device for implanting microchips in research animals.  The device was intended to speed the process of taking animals' temperatures.  Dr. Kurtzman told Dr. Stone that the BMDS device was not effective and that a different company made a better unit (doc. no. 45-1 at 11, Kurtzman Dep.).  Dr. Stone insisted that plaintiff make a good faith effort to use the BMDS device.  Plaintiff indicates he fully complied and made numerous efforts to get the device to work properly but was unable to obtain good results (doc. no. 82 at 13-14, describing repeated efforts by plaintiff, along with Dr. Kemper and other individuals).  Despite all these efforts, the device did not work well (doc. no. 65 at 123, 137, Stone Dep., acknowledging that although over a dozen chips had been implanted for testing, they were not able to obtain accurate results until they later used an improved "reader").

As part of these efforts, plaintiff arranged for BMDS to demonstrate its device, and on May 30, 2008, plaintiff notified his colleagues by email (doc. no. 44-27, copy of email). Dana Buesing, assistant for Dr. Roy-Chaudhury, notified plaintiff that the surgery intended for the demonstration was cancelled (doc. nos. 67-22 at ¶ 10, Buesing Aff.; 46-6 at 156-57, Kurtzman Dep.). When plaintiff contacted BMDS, the representative ("Hunt") indicated he would still come and go ahead with the demonstration by using a carcass (doc. no. 82 at 15, citing doc. no. 44-6, Kurtzman Dep. at 159). Plaintiff was unable to attend the scheduled demonstration on June 26, 2008, due to a recurrence of his illness through July 7, 2008. When Hunt did not show up for the demonstration, Dr. Stone believed that plaintiff (rather than BMDS) had cancelled and then misled him about it. In fact, BMDS had cancelled by email the evening before the demonstration. Although BMDS later acknowledged this to Dr. Stone (doc. no. 64, Stone Dep. at 178-82),[2] he continued to blame plaintiff for not notifying him of the cancellation, even though plaintiff was out sick at the time. Between April and June 2008, plaintiff and Dr. Stone had several meetings with Theresa Murphy, UC Human Resources Director, in an effort to resolve their misunderstandings. Plaintiff indicates that Dr. Stone's allegations were "determined to be incorrect" and his "write-up" of plaintiff was dismissed (doc. no. 44-29 at 2).[3]

---

[2]Plaintiff also showed him the June 25, 2006, 9:56 p.m. e-mail from __BMDS__ cancelling the meeting (doc. nos. 64 at 179, Stone Dep.; 66-7, Ex. 7 at 1061).

[3]At the hearing, plaintiff referred to Ex. 44, indicating that Dr. Stone had conferences with Theresa Murphy, UC Human Resources Director, who noted that Dr. Stone was "acting out," rather than dealing with work issues. Murphy acknowledged that Stone was "angry" with plaintiff and did not "trust" him (doc.

As already discussed, Dr. Stone had already limited Dr. Kurtzman to the MSB facility. In August of 2008, he then removed plaintiff's responsibilities for oversight of "Vet Tech" training, which further reduced plaintiff's supervisory responsibilities.

On February 3, 2009, Dr. Stone reprimanded him for alleged "inadequate veterinary care" (doc. no. 45-18). Dr. Stone accused plaintiff of not examining a dog, although plaintiff indicated he did in fact examine the dog. Dr. Stone then criticized him for not detecting a heart arrythmia during the examination, although the arrythmia had already been noted in an initial exam by a veterinary technician (doc. no. 45-1 at 18). Plaintiff denied any "inadequate veterinary care" and explains that arrythmias are common in dogs and did not affect the well-being of this animal (doc. no. 82 at 30). Evidence, including the testimony of Dr. Steele Mattingly, Professor Emeritus and Administrative Director of LAMS, and the affidavit of Bernard Doerning, D.V.M., supports plaintiff's contention (doc. no. 49 at 6, ¶ 31).

According to plaintiff, Dr. Stone was quick to reprimand him on flimsy grounds, but did not reprimand other UC veterinarians, even for serious mistakes. For instance, in September 2008, a research pig "intubated" by Dr. Matu suffered a lacerated trachea that became infected. The pig's injury was neglected, which led to the pig's respiratory distress and death (doc. no. 60 at 53, Kurtzman Dep.). Plaintiff spoke about this with Dr. Stone, who had performed a necropsy on the pig (doc. nos. 45-1 at 25; 64 at 248). When Dr. Stone did not follow up on the matter, plaintiff sent Dr. Degen an email on February 12, 2009 (doc. no. 45-1 at 21, "Dr.

nos. 62 at 17, 26-27, 45-46, 59-60, Murphy Dep.).

Degen, I have been advised to talk to you by both Dr. Mattingly and Theresa Murphy about health care issues in LAMS").

On February 17, 2009, plaintiff personally discussed his concerns about the incident with Dr. Degen, who merely indicated that she had already discussed it with Dr. Stone and did not want to see any documents, despite the fact that she was in charge of the Institutional Animal Care and Use Committee ("IACUC") (doc. no. 45-1 at 22-24, Kurtzman Dep.; doc. no. 56 at 16, Degen Dep., indicating that "Kurtzman was concerned that Stone wasn't following up in investigations regarding health issues . . . that's what I wrote"). The IACUC is an oversight committee responsible for UC's compliance with the rules and regulations for animal research (doc. 55 at 104-05, Degen Dep.). Dr. Stone did not reprimand Dr. Matu for "inadequate veterinary care" of the pig, nor do the IACUC minutes reflect that Dr. Stone ever reported the incident to the IACUC (doc. no. 82 at 34, citing doc. nos. 52 at 47, Anderson Dep.; 53 at 34-36, Babcock Dep.; 64 at 266, Stone Dep.).

Meanwhile, on February 16, 2009, plaintiff also made various complaints about Dr. Stone's ongoing hostility toward him in a letter to George Wharton, Director of Equal Employment Opportunity in UC's HR Department. Plaintiff indicated that Dr. Stone had "told my co-workers I was faking my illness," had restricted his movement to only the MSB animal facility, that he was under "constant scrutiny" by Dr. Stone, and that Dr. Stone treated him differently than the other UC veterinarians

(doc. no. 44-29, Letter, ¶¶ 4, 6).[4] Ultimately, plaintiff decided not to "file" the letter as a formal charge.

Several days later, on February 20, 2009, Dr. Stone removed plaintiff's supervisory authority over the remaining veterinary technicians (doc. no. 60 at 9, Kurtzman Dep.). Dr. Stone changed plaintiff's job title from "Associate Director" of LAMS to "Senior Veterinarian," which plaintiff considered to be a significant demotion. Dr. Stone then explored the possibility of eliminating plaintiff's position for financial reasons, as a significant budget cut was anticipated. This possibility was rejected by the HR Department (doc. nos. 62 at 118-119, Murphy Dep.; 46-2 at 8, ¶¶ 27-29, Stone Aff.). Dr. Stone indicates that he then intended to terminate plaintiff's employment "without cause" (which would have entitled plaintiff to six months' severance under UC policy), but then suffered a heart attack on April 23, 2009 before doing so (doc. nos. 46- 2, Stone Aff. ¶¶ 27-31; 65 at 1512, Stone Dep.; 56 at 18-19, 30, Degen Dep.).

While Dr. Stone was on sick leave from April 23 until July 26, 2009, Dr. Kemper was named Interim Director of LAMS (doc. no. 46-3 at 8, Degen email).[5] In

---

[4]Plaintiff complained to the EEO officer that Dr. Stone favored the less senior staff veterinarians, including Dr. Matu. Plaintiff points out that he was substantially more experienced in large animal surgery and had far better credentials than Matu, who had a foreign degree, failed his veterinary exams eighteen times before finally passing on the nineteenth attempt in December 2007, and had only a limited license (doc. no. 69 at 23, 32, Matu Dep.).

[5]Although Dr. Degen sent the email in April 2009 naming Dr. Kemper as interim director, Dr. Stone indicates in his affidavit that he made the decision back in December 2008 that Dr. Kemper would serve as director whenever he was not present (doc. no. 46-2 at 8, ¶ 25). Dr. Stone indicates that "although Mark

May of 2009, Dr. Kemper told Dr. Degen that plaintiff had been copying records at the Shriner's Hospital, where Dr. Matu was assigned. Although plaintiff was no longer assigned to that facility, he indicates he was copying his own previous sign-in sheets, not any animal care records. On June 2, 2009, Dr. Degen met with plaintiff to discuss her concerns, including plaintiff's copying of "records" at the Shriner's facility. She acknowledged there was "no written rule" against getting these records, but that it was "suspicious" and "looked bad," and she advised plaintiff that "he should look for another job" (doc. nos. 56 at 83-86, Degen Dep.; 44-6 at 25, Kurtzman Dep.).

On July 26, 2009, plaintiff's counsel sent a letter to Drs. Stone and Degen, setting forth plaintiff's complaints of allegedly retaliatory behavior by Dr. Stone and alleging that the defendants had violated plaintiff's FMLA and First Amendment rights (doc. no. 45-26, Letter). On August 11, 2009, plaintiff filed the present action, alleging that UC and Dr. Stone had discriminated and retaliated against him in violation of the FMLA and the First Amendment (doc. no. 1 at ¶ 2).

Plaintiff then received a letter dated August 27, 2009, terminating his employment for an alleged "pattern of unacceptable behavior." Dr. Degen's letter recited four reasons: 1) unsatisfactory contact with a vendor (i.e. the BMDS incident); (2) inappropriately interacting with the Ohio Board of Pharmacy; (3) improper conduct in obtaining records from Shriner's Hospital; and (4) "lack of adequate veterinary care" (doc. no. 46-3, Degen Aff., ¶ 8, Ex. 6 "Letter"). Except for

_____

Kurtzman had more experience, I did not trust his judgment . . . ." (Id.).

the OPB incident in 2007, these reasons pertained to incidents that occurred after plaintiff' returned from extended sick leave in March 2008.

Plaintiff then amended his complaint to add Dr. Degen as a defendant. The amended complaint alleges that the defendants: 1) violated plaintiff's rights under the Family Medical Leave Act ("FMLA"), at 29 U.S.C. § 2601 et seq. (¶¶ 54-55); 2) violated his First Amendment rights (¶¶ 56-57); 3) published defamatory statements about him under Ohio common law (¶¶ 58-59); and 4) terminated him in violation of Ohio public policy (¶¶ 60-61). Plaintiff asks for: 1) a declaration that the defendants violated his rights under the FMLA, First Amendment, and Ohio law; 2) reinstatement to his former position; 3) "economic and non-economic" damages; 4) punitive damages; 5) attorney fees and costs; and 6) any other relief to which he is entitled (doc. no. 3 at 10).

The parties conducted discovery and filed numerous depositions and other exhibits in the record. The defendants moved for summary judgment (doc. no. 46), and plaintiff responded (doc. no. 70). The Magistrate Judge recommended that summary judgment be granted to defendants on the FMLA and First Amendment claims and that the state law claims be dismissed (doc. no. 76). Plaintiff made lengthy objections to certain recommendations regarding the FMLA and First Amendment claims (doc. no. 82). These matters are fully briefed and ripe for consideration.

## II. Standard of Review

Rule 56(a) of the Federal Rules of Civil provides in relevant part that:

> A party may move for summary judgment, identifying each
> claim or defense--or the part of each claim or defense--on
> which summary judgment is sought. The court shall grant
> summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).

Under Rule 56, the moving party bears the burden of proving that no genuine dispute

of material fact exists.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 586 (l986). The court must construe the evidence and draw all reasonable

inferences in favor of the nonmoving party.  <u>Id</u>. at 587.   The court must determine

"whether the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law."

<u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 251-52 (1986).  A genuine dispute exists

"only when there is sufficient evidence on which the jury could reasonably find for

the plaintiff."  <u>Id</u>. at 252.   On summary judgment review, the court's role is not to

"weigh the evidence and determine the truth of the matter," but rather, to determine

whether there are any genuine disputes of material fact for trial.  <u>Id</u>. at 249.

<u>III.  Discussion</u>

<u>A.  Recommendations Regarding Sovereign Immunity, Dismissal of State Law Claims,</u>

<u>and Individual Liability</u>

        In her Report and Recommendation, the Magistrate Judge initially observed

that plaintiff had not disputed three meritorious issues raised by the defendants,

namely 1) "that UC is immune for money damages under any theory based upon the

doctrine of sovereign immunity, as are the two individual defendants sued in their

official' capacities;" 2) that the two state law claims (Count Three for defamation and Count Four for termination in violation of public policy) must be dismissed for lack of jurisdiction; and 3) "that Degen and Stone cannot be held liable as individuals under the FMLA because neither can be considered to be Plaintiff's employer" as defined by the statute (doc. no. 76 at 9).

Plaintiff has not objected to these recommendations, and the Court agrees with them.  First, the Eleventh Amendment to the United States Constitution bars plaintiff from bringing state law claims against a state university and its officials in their official capacity in federal court.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984) (holding that "[i]t is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment");  Nuovo v. The Ohio State University, 726 F.Supp.2d 829, 850 (S.D.Ohio 2010) (holding that a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment).  Plaintiff concedes this (doc. no. 70 at 11).

Second, plaintiff cannot pursue state law claims against Drs. Stone and Degen in their individual capacity because they are entitled to immunity from suit under state law.  "Ohio law requires that, as a condition precedent to asserting a cause of action against a state employee in his individual capacity, the Court of Claims must first determine that the employee is not entitled to immunity provided for in Revised

Code § 9.86." <u>Haynes v. Marshall</u>, 887 F.2d 700, 705 (6th Cir. 1989).[6] "Prior to that condition being satisfied, then, there is no claim under Ohio law upon which relief may be granted against state employees in their individual capacities." <u>Id</u>. Therefore, Counts Three and Four (the state law claims) must be dismissed, and plaintiff concedes this point. See, e.g., <u>Alexander v. Ohio State University College of Social Work</u>, 2008 WL 4823081 (S.D.Ohio) (dismissing plaintiff's state law claims for failure to comply with O.R.C. § 9.86); <u>Kingsley v. Brundige</u>, Slip Copy, 2011 WL 1043924 (S.D.Ohio) (same).

Third, the individual defendants Drs. Degen and Stone are not "employers" for purposes of the FMLA and may not be held liable for monetary damages under the statute. See <u>Mitchell v. Chapman</u>, 343 F.3d 811, 829-32 (6th Cir. 2003) ("Our independent examination of the FMLA's text and structure reveals that the statute does not impose individual liability on public agency employers"). Plaintiff appropriately concedes this point (doc. no. 70 at 11).

The Magistrate Judge observed that the plaintiff's FMLA claims survive to the extent he seeks prospective injunctive relief, i.e. reinstatement and attorney fees, under <u>Ex Parte Young</u>, 209 U.S. 123 (1908). The Magistrate Judge noted the lack of binding precedent in this circuit as to whether reinstatement is "prospective," but

_____

[6]Ohio R.C. § 9.86 provides in relevant part that "no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner."

recommended that the majority of courts to consider the issue have found that an employee's claim for reinstatement against a public employer is a claim for prospective equitable relief (doc. no. 76 at 9-13, collecting cases). The Court agrees with this additional recommendation. This reduces the plaintiff's case to: (1) claims under the FMLA for equitable relief; and (2) a First Amendment retaliation claim under 42 U.S.C. § 1983.

**B. Whether Genuine Disputes of Material Fact Exist Regarding the FMLA Claim**

In Count One, plaintiff's amended complaint alleges "violation of the FMLA," but does not specify whether plaintiff is proceeding under the "interference/entitlement" theory arising from 29 U.S.C. § 2615(a)(1) or the "retaliation/discrimination" theory arising from 29 U.S.C. § 2615(a)(2). The Magistrate Judge recommended that under existing case law, the alleged facts would support a legally cognizable claim of retaliatory discharge under either theory (doc. no. 76 at 17-21). See Seeger v. Cincinnati Bell Telephone Co., LLC, -- F.3d --, 2012 WL 1592670, *6-7 (6th Cir. (Ky) ("we have held that a claim for retaliatory discharge is cognizable under either theory"). In Seeger, the Court of Appeals for the Sixth Circuit recently explained that:

> Although we have held that a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. Arban, 345 F.3d at 401. The central issue raised by the retaliation theory, on the other hand, is "whether

the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted). In contrast to the interference theory, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." Id.

Seeger, 2012 WL 1592670 at *6-7.

### 1. The FMLA Claim Under an Interference Theory

An employer's interference with an employee's right to reinstatement following FMLA leave violates the FMLA. Arban v. West Pub. Corp., 345 F.3d 390, 400 (6th Cir. 2003). To establish a prima facie "interference" claim under the FMLA, a plaintiff must show that (1) he is an "eligible employee" under the FMLA; (2) defendant is an "employer" for purposes of the FMLA; (3) the employee was entitled to FMLA leave; (4) the employee gave his employer notice of his intention to claim leave; and (5) the defendant denied plaintiff FMLA benefits to which he may have been entitled. Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549, 556 (6th Cir. 2006). Defendants have moved for summary judgment based on the fourth and fifth elements.

At the fourth element, defendants argue that plaintiff never exercised any rights under the FMLA because the printed forms for his extended sick leave do not expressly indicate "FMLA leave"(doc. no. 46 at 23). The Magistrate Judge correctly observed (doc. no. 76 at 14) that an employee does not have to "expressly invoke the FMLA" in order to claim protection under the Act. Cavin v. Honda of America Mfg., Inc., 346 F.3d 713, 723-24 (6th Cir. 2003) (holding that plaintiff's repeated phone calls

advising of his hospitalization were sufficient to give his employer reasonable notice of requested FMLA leave as a matter of law); Arban, 345 F.3d at 400 ("All the employee must do is notify the employer that FMLA-qualifying leave is needed."). The regulations provide that verbal notice is sufficient and that "the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c); see also, 29 C.F.R. § 825.303(b) ("An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request.").

The parties acknowledge that plaintiff requested, and was granted, approximately six weeks of leave for a serious medical condition. The "Time Off From Work" forms reflect that plaintiff's requests for extended sick leave (from January 28 to March 5, 2008, and again from June 26 to July 3, 2008) were approved (doc. nos. 44-21 "Form;" 44-15 email; 64 at 56-59, Stone Dep.). Plaintiff gave sufficient notice of his serious illness and his need for leave, and the Court agrees with the recommendation that plaintiff adequately invoked his rights under the FMLA. Defendants are not entitled to summary judgment on such basis.

At the fifth step, defendants correctly point out that there is no dispute that plaintiff was given all the leave he requested. The Magistrate Judge, however, observed that a plaintiff can also prove this element by showing that the defendants "used the leave against [the employee] and in an unlawful manner, as provided in either the statute or regulations" (doc. no. 76 at 15, citing Wysong v. Dow Chem. Co., 503 F.3d 441, 447 (6th Cir. 2003)). The regulations provide that an employer's failure

to restore an employee to "the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment" is a violation of the FMLA. 29 C.F.R. § 825.214.

Plaintiff points out that upon his return from sick leave, Dr. Stone announced that he was removing plaintiff's supervisory responsibilities for all facilities except MSB (doc. no 45-7 at 194-196). Although the defendants argue that plaintiff did not immediately suffer a "loss of pay or title" upon his return, an employer cannot lower an employee's rank, job status and responsibility for a discriminatory reason and then insulate itself from liability "merely be maintaining the same pay level." Wilson v. Advance Mortgage Corp., 798 F.2d 1417, n.1 (6th Cir. 1986) ("salary is not necessarily a conclusive or exclusive indicator of a demotion").

Upon plaintiff's return, he had significantly reduced responsibilities and authority. He was later relieved of additional supervisory authority over veterinary technicians and his job title was reduced from "Associate Director" to "Senior Veterinarian." See Kocsis v. Multi–Care Mgmt., Inc. 97 F.3d 876, 886 (6th Cir. 1996) (observing that demotions, including "a less distinguished title" or "significantly diminished responsibilities" may amount to adverse employment actions). Plaintiff contends that Dr. Stone "step by step removed Kurtzman from the top of LAMS to the bottom . . . by moving him from associate director in charge of all vets and vet techs in all nine facilities, to a clinical veterinarian position with no supervisory responsibility" (doc. no. 70 at 17). The Court agrees with the recommendation that the defendants are not entitled to summary judgment on the FMLA interference claim

on the grounds asserted (doc. no. 76 at 17). Genuine disputes of material fact exist as to whether the defendants denied plaintiff his substantive right to reinstatement.

Although the Magistrate Judge later suggests, based on Dr. Stone's own affidavit, that "the changes in plaintiff's job duties are easily attributed to legitimate restructuring" (doc. no. 76 at 23), the plaintiff specifically pointed to evidence suggesting that his demotion was in fact connected with his use of FMLA leave (doc. no. 70 at 18-21, asserting that "Kurtzman's long years of service, his excellent evaluation prior to FMLA, the timing of his demotion, and the negative comments by Stone all show that Kurtzman's demotions were 'connected' to his FMLA leave"). While the evidence might permit differing inferences, the facts must be construed in favor of the plaintiff as non-moving party on summary judgment review. The Court may not weigh the evidence or make credibility determinations. This claim may proceed to trial.

### 2. The FMLA Claim Under a Retaliation Theory

To establish a prima facie case of FMLA retaliation, a plaintiff must show that: (1) he availed himself of a protected right under the FMLA by notifying his employer of his intent to take leave; (2) he experienced an adverse employment action; and (3) there is a causal connection between his exercise of FMLA rights and the adverse employment action. Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 314 (6th Cir. 2001); see also, Smith v. Heartland Employment Services, LLC, 2009 WL 799640

**\*13 (S.D.Ohio 2009).**[7] "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). As already discussed, it is undisputed that plaintiff satisfied the first two criteria because he pointed to evidence that 1) he had repeatedly notified UC LAMS of his illness and need for leave, and 2) upon returning from leave, was demoted and ultimately terminated.

At the third step, the defendants argued a "lack of causal connection" between plaintiff's use of FMLA leave and the adverse actions against him (doc. no. 46-1 at 7-8). In response, plaintiff pointed to his years of employment at UC (since 2000), his positive evaluation in 2007 prior to his FMLA leave, the timing of his demotion upon his return (followed by more adverse actions, including termination), Dr. Stone's comments that plaintiff had previously "never called in sick" and his discussions with others reflecting his suspicion that plaintiff was "faking" his illness, and Dr. Stone's alleged negative comment to plaintiff (i.e. "how can I trust you when you are gone so long?") (doc. no. 70 at 18-21). The Magistrate Judge recommended, and this Court agrees, that plaintiff has identified sufficient evidence to establish a prima facie case of FMLA retaliation, including causal connection (doc. no. 76 at 17-21). While burden shifting would not apply with direct evidence, much of the cited evidence is "indirect" circumstantial evidence, and the parties have not disputed that the burden-

---

[7]Plaintiff recites the elements for his retaliation claim (doc. no. 70 at 23) somewhat differently than the Magistrate Judge (doc. no. 76 at 17), but does not object on such basis.

shifting analysis should apply.

### 3. The FMLA Claim: Burden-Shifting and Pretext

A retaliation claim based on indirect evidence is subject to the <u>McDonnell Douglas</u> burden-shifting test. <u>Skrjanc</u>, 272 F.3d at 313 (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)). After a plaintiff presents a prima facie claim, the burden of production shifts to the defendants to state a nondiscriminatory reason for plaintiff's termination. <u>Id</u>. at 315. The burden then shifts back to plaintiff to show that defendants' stated reasons were merely a pretext for discrimination. Plaintiff must produce "evidence from which a jury could reasonably doubt the employer's explanation." <u>Chen v. Dow Chem. Co.</u>, 580 F.3d 394, 400 n. 4 (6th Cir. 2009).

As the Magistrate Judge correctly observed (doc. no. 76 at 22), a plaintiff may establish pretext by showing that the defendant's stated reasons "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." <u>Staunch v. Continental Airlines, Inc.</u>, 511 F.3d 625, 631 (6th Cir.), *cert. denied*, 555 U.S. 883 (2008). "[R]etaliation claims turn on the employer's motive for discharging the plaintiff." <u>Bryson v. Regis Corp.</u>, 498 F.3d 561, 572 (6th Cir. 2007). Plaintiff must point to evidence that would permit a reasonable fact-finder to conclude that the defendant's stated reasons for termination were not the real reason and were a pretext for unlawful retaliation. <u>Id</u>. Despite the shifting burdens of production, the plaintiff retains the "burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." <u>Bryson</u>, 498 F.3d at 570; <u>Chen</u>, 580 F.3d at 400 n. 4 ("the question is always whether the employer made up its

stated reason to conceal intentional discrimination"); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (observing that "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason").

Under the burden-shifting analysis of <u>McDonnell Douglas</u>, the Magistrate Judge recommended that plaintiff had not shown sufficient evidence of pretext to survive summary judgment (doc. no. 76 at 21-26). Plaintiff objects to the Magistrate Judge's pretext analysis and argues that: 1) the Magistrate Judge substituted the employer's four stated reasons for termination with reasons of her own; 2) the Magistrate Judge ignored plaintiff's arguments that the four reasons were pretextual; 3) plaintiff has shown sufficient evidence of pretext to survive summary judgment; and 4) the Magistrate Judge Improperly Invoked the "honest belief" defense *sua sponte*, but regardless, a question of fact exists as to whether the defendants made a "reasonably informed and considered decision" before terminating plaintiff (doc. no. 82 at 3-52). For the most part, the Court will sustain these objections.

These objections all concern whether plaintiff has carried his burden of showing pretext and may logically be considered together. Plaintiff points out that the Magistrate Judge essentially ignored his lengthy explanations as to why the stated reasons for his termination were pretextual, and instead, merely accepted the defendants' contention that Drs. Stone and Kurtzman simply did not get along (doc. no. 76 at 22-23). The Magistrate Judge concluded that plaintiff had not overcome the

"legitimate and nondiscriminatory" reasons for his termination. (Id. at 24).

Plaintiff's response brief extensively discussed why the four stated reasons for his termination were pretextual (doc. no. 70 at 25-54). First, he contended that the general reason of "inappropriate conduct" was false because the four underlying examples were false. He points to evidence showing that he did not cancel the BMDS demonstration, he did not contact the OBP again, the defendants acknowledge that he did nothing wrong by copying his own sign-in sheets from the Shriner's facility, and that Dr. Stone's reprimand of him for "lack of veterinary care" was unwarranted because it was, at most, a short-coming in documentation, rather than any actual deficiency in "care." Plaintiff points to numerous exhibits in support of his arguments that the four stated reasons for his termination were false, insufficient to motivate termination, and that other UC veterinarians were not even reprimanded, much less terminated, after incidents involving "inadequate care" (doc. no. 82 at 6-32).

To show pretext, the reason must be shown to be "false, and that discrimination was the real reason." St. Mary's Honor Ctr., 509 U.S. at 515. Plaintiff discussed each of the employer's four stated reasons at length and pointed to deposition testimony and other evidence to support his contention that these reasons were false. He also pointed to evidence suggesting that Dr. Stone's hostility toward his use of FMLA leave was part of the reason for his discharge.

The Magistrate Judge largely relied on a single alleged comment by Dr. Stone (i.e. "how can I trust you when you are gone so long") and recommended that this was insufficient evidence by itself to show pretext (doc. no. 76 at 22). Plaintiff, in his

response and objections, referred to much more evidence than this. Plaintiff had a positive work evaluation prior to taking FMLA leave. Upon his return from leave, Dr. Stone (who was admittedly skeptical of plaintiff's illness) advised that he was demoting plaintiff, and later further reduced plaintiff's supervisory authority and title. Plaintiff reported to UC's EEO officer that Dr. Stone was hostile and disrespectful toward him in meetings, and was telling people that plaintiff had been "faking" his illness, despite the fact that plaintiff had been seriously ill with debilitating symptoms and had lost a remarkable amount of weight in a relatively short period of time. Construing the evidence and reasonable inferences in plaintiff's favor for purposes of summary judgment review, the evidence suggests that Dr. Stone's unfavorable attitude toward plaintiff may well have been influenced by plaintiff's use of FMLA leave. The record supports a reasonable inference that Dr. Stone held plaintiff's use of FMLA leave against him when Dr. Stone subsequently demoted him and laid the groundwork for his termination.

The timing of Dr. Stone's decision to demote plaintiff is suggestive, as it occurred immediately after his use of FMLA leave. The BMDS incident, which occurred shortly after plaintiff returned from extended leave for illness, also reflects Dr. Stone's inclination to distrust plaintiff's explanations. Plaintiff's letter to the EEO officer, his attorney's letter, and his subsequent lawsuit all complained of FMLA-related discrimination. Plaintiff was promptly terminated after raising such concerns. Construing the evidence in plaintiff's favor for purposes of summary judgment review, the Court finds that the plaintiff has shown sufficient evidence of pretext for

his FMLA retaliation claim to proceed.

Although defendants point to several disagreements between Stone and plaintiff prior to plaintiff's illness and FMLA leave (i.e. the OPB and guinea pig incidents in 2007), some workplace conflicts are inevitable in the administration of a major research facility involving multiple veterinarians, staff, and over 35,000 animals. The existence of several prior disagreement does not mean that Dr. Stone did not later hold plaintiff's use of FMLA leave against him. Plaintiff points out that the OPB matter was resolved and that his work evaluation in 2007 was very positive.

The defendants also argue that Dr. Degen was "unaware" of Dr. Stone's alleged comment to plaintiff regarding his FMLA leave. Regardless, Dr. Degen was presumably aware of plaintiff's letter to UC's EEO officer, in which plaintiff had complained that Dr. Stone had told people that plaintiff was "faking" his illness. Dr. Stone reported his reasons for wanting to terminate plaintiff to Dr. Degen, whose subsequent letter recited four general reasons. If those reasons were rooted in Dr. Stone's impermissible antagonism toward plaintiff's use of FMLA leave, then the stated reasons for discharge may indeed be pretextual. In other words, although inability to get along with a supervisor is a legitimate reason for discharge, the supervisor's hostility toward an employee for that employee's use of FMLA leave is not a legitimate reason for discharge. The plaintiff has sufficiently shown "pretext" to withstand summary judgment on his FMLA retaliation claim.

Finally, plaintiff objects that the Magistrate Judge Improperly Invoked the "honest belief" defense *sua sponte.* The Magistrate Judge could certainly address

this legal concept, but the record contains no evidence suggesting that Dr. Degen conducted any investigation, much less a "reasonable" one, of the four stated reasons for discharge. Although UC asserts that Dr. Degen was "fully informed," plaintiff contends that Dr. Degen was unaware of many relevant details and did not conduct a reasonable investigation of the reasons given for plaintiff's termination. For example, plaintiff points out that "between the June meeting and August 27, 2009, nobody complained about Kurtzman's work performance, nobody said he was disrupting work at LAMS, and nobody told her that Kurtzman had done anything to cause Stone not to trust him" (doc. no. 82 at 39, citing doc. no 56 at 66-67, Cox Dep.). Plaintiff's demotions and termination after taking FMLA leave were allegedly based on past incidents which his employer was already aware. See Arban, 345 F.3d at 402.

For an employer to avoid a finding that its alleged nondiscriminatory reasons were pretextual, the employer "must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." Brooks v. Davey Tree Expert Co., Slip Copy, 2012 WL 1293578, *8 (6th Cir. (Tenn.)) (citing Smith, 155 F.3d at 806–07). The defendants have not done so. In Brooks, the Court of Appeals for the Sixth Circuit explained:

> In determining whether an employer "reasonably relied on the particularized facts then before it . . . the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Id. (citing Burdine, 450 U.S. at 256). Although we will not "micro-manage the process used by employers in making their employment decisions," we also will not "blindly assume that an employer's description of its reasons is honest." Id. Therefore,

> "[w]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." Id. at 807–08.

Plaintiff has put forth sufficient evidence to establish that his employer did not make a reasonably informed and considered decision before taking the adverse employment actions against him, and thus, the defendants are not entitled to summary judgment on the basis of the "honest belief" rule.

## C.  The First Amendment Claim

In Count Two, plaintiff alleges that the defendants also retaliated against him in violation of his First Amendment rights via 42 U.S.C. § 1983, which allows a plaintiff to vindicate the deprivation of constitutional rights by a defendant acting under color of law. Harbin–Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005).  The First Amendment to the United States Constitution provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  T h e defendants moved for summary judgment on the basis that (1) all of plaintiff's allegedly protected "speech" related to his employment with UC, and was not speech as a private citizen; and (2) such speech was not on matters of public concern (doc.

no. 46-1 at 11, 18).[8]  The defendants noted that plaintiff (in his discovery responses) had listed eight examples of allegedly protected speech: (1) plaintiff's emails to his supervisor in December 2006 regarding missed treatments by Dr. Matu; (2) a March 2008 proposal to contact the OPB about licensing at UC LAMS; (3) his  contact with the USDA about glaucoma in rabbits; (4) a discussion with Dr. Degen in February 2009; (5) emails about  the appropriate dose of Xylazine in animal protocols in February/March 2009; (6) a July 26, 2009 letter from plaintiff's counsel to the defendants; (7 & 8) plaintiff's Complaint and Amended Complaint in this lawsuit. (Id. at 13, citing doc. no. 45-29 "Interrogatory Responses").

The defendants correctly pointed out that the first five examples of speech directly concerned and were made pursuant to plaintiff's work responsibilities as a UC LAMS veterinarian.  Defendants argued that the next three examples (i.e. his attorney's demand letter, the initial complaint, and the amended complaint) were all based on and "derivative of" plaintiff's workplace disputes (Id. at 14).  Defendants contend that the plaintiff may not "constitutionalize workplace grievances" merely by sending an attorney letter and aptly point out that the First Amendment is not a "whistleblower" statute.

In analyzing these arguments, the Magistrate Judge first observed that plaintiff

_____

[8]Although plaintiff quibbles about use of the term "related to," his attorney's own letter indicated that it concerned "matters related to [plaintiff's] employment at the University of Cincinnati."  Moreover, the United States Supreme Court used the term "related to" when explaining that not all employee speech is protected.  Connick, 461 U.S. at 146.  Only speech that "fairly [may be] considered as relating to" issues "of political, social, or other concern to the community." Id.

is barred by sovereign immunity from obtaining monetary damages on this claim from UC (and the individual defendants in their official capacities) and that this claim, like the FMLA claims, would be limited to equitable relief (doc. no. 76 at 10, 26).

The Magistrate Judge then examined what "speech" is actually at issue. The Magistrate Judge noted the plaintiff's eight examples of speech (doc. no. 76 at 28), but then observed that plaintiff in his deposition and brief had identified only his attorney's letter of July 26, 2009 and the filing of this lawsuit as allegedly "protected speech" (doc. nos. 45-6 at 170-171, Kurtzman Dep.; 70 at 56-58, 62-63). The Magistrate Judge recommended that the first five examples "all occurred on his employer's time and in the context of his professional duties as a veterinarian" and that the last three examples (the letter and lawsuit) could not "bootstrap" non-protected speech into a First Amendment claim (doc. no. 76 at 28, 31).

The Magistrate Judge recommended that the plaintiff had to prove: (1) that his speech concerned "matters of public concern;" (2) that his interests outweighed the interests of the state employer; and (3) that his speech was not made pursuant to his official duties (doc. no. 76 at 26, citing Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Distr., 624 F.3d 332, 337-338 (6th Cir. 2010)); see also, Hughes v. Region VII Area Agency on Aging, 542 F.3d 169, 180 (6th Cir. 2008). The Magistrate Judge found the third factor dispositive and recommended that summary judgment be granted on this claim. This Court agrees that summary judgment is appropriate on this claim, but for different reasons.

In his objections, plaintiff confirms that he is only contending that his

counsel's letter and the filing of this lawsuit amounted to "protected speech" (doc. no. 82 at 61). He then argues that these were "outside his official duties" as a UC veterinarian and points to testimony acknowledging that the lawsuit was not part of his "official duties" and was "on his own time" (doc. no. 82 at 56-59).

The Magistrate Judge rejected the notion that the mere act of filing suit is protected activity (doc. no. 76 at 30-31). The Magistrate Judge cited <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 187-88 (2d Cir. 2008), where the court observed that "[t]o hold otherwise - that filing a lawsuit alleging retaliation for non-protected speech would give rise to a First Amendment complaint - would defy logic, allowing a plaintiff to bootstrap a non-actionable objection into a valid First Amendment claim" (doc. no. 76 at 30).

The United States Supreme Court's recent decision in <u>Borough of Duryea, Penn. v. Guarnieri</u>, 131 S.Ct. 2488, 2494 (2011) explained that a public employee's lawsuit, depending on its contents, may be a petition protected by the Petition Clause of the First Amendment, which "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes," <u>Id.</u> at 2494, but in the context of employment retaliation suits emphasized that the right to bring a lawsuit "is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." <u>Id</u>. at 2501.

Plaintiff's claim here is brought under the Speech Clause, but in either case, the plaintiff must show that he was raising issues of public concern. In <u>Borough</u>, 131 S.Ct. at 2498, the United States Supreme Court explained:

> If the Petition Clause were to apply even where matters of public concern are not involved, that would be unnecessary, or even disruptive, when there is already protection for the rights of public employees to file grievances and to litigate. The government can and often does adopt statutory and regulatory mechanisms to protect the rights of employees against improper retaliation or discipline, while preserving important government interests. Cf. <u>Garcetti</u>, supra, at 425, 126 S.Ct. 1951 (noting a "powerful network of legislative enactments"). Employees who sue under federal and state employment laws often benefit from generous and quite detailed antiretaliation provisions . . . The Petition Clause is not an instrument for public employees to circumvent these legislative enactments when pursuing claims based on ordinary workplace grievances.

Where a public employee raises a First Amendment retaliation claim based on either the Speech or Petition Clause, the employee must show that his "speech" involved a matter of public concern. <u>Borough</u>, 131 S.Ct. at 2491–95. Whether certain employee speech "addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." <u>Connick</u>, 461 U.S. at 147–48. Typically, a "matter of public concern generally involves a matter of political, social, or other concern to the community." <u>See v. City of Elyria</u>, 502 F.3d 484, 492 (6th Cir. 2007).

Under either the Speech or Petition Clause, plaintiff has not shown that he is raising issues of public concern here. Plaintiff mischaracterizes his attorney's letter and this lawsuit as raising "animal health care issues as a matter of public concern." While animal health care may indeed be a matter of public concern (as the Magistrate Judge correctly noted), plaintiff's attorney letter and lawsuit concern <u>his own</u>

employment, rather than any broader purpose.  His characterization of this lawsuit is belied by his own prayer for relief, which asks for reinstatement and damages for himself, rather than any injunctive relief for the care of animals or compliance with research regulations.  The present suit was not brought to remedy alleged violations of animal care regulations.  Plaintiff's complaint does not cite any such regulations and does not seek to force compliance with any.  Plaintiff's complaint raises only employment-based claims. While a speaker's motive is not dispositive in assessing whether his speech addresses a matter of public concern, see Connick, 461 U.S. at 148-49, the content of the "speech" here concerns the circumstances of his own employment (i.e., demotion and termination) and cannot fairly be viewed as a matter of public concern.  In other words, a plaintiff's internal workplace disputes are not matters of public concern entitled to First Amendment protection.  As the United States Supreme Court has explained, an employee may not "constitutionalize" his workplace grievances.  Garcetti v. Ceballos, 547 U.S. 410, 420 (2006) (quoting Connick, 461 U.S. at 154).

The cases that plaintiff cites regarding speech of "public concern" are inapposite. For example, although plaintiff cites Westmoreland v. City of Bay Village, 662 F.3d 714 (6th Cir. 2011), that case involved an individual firefighter who, in light of several local deaths from drowning, appeared before a legislative body at a public hearing on his own time to urge that the community restore funding for certain public services, i.e. the city's rescue dive team. This cannot fairly be equated, as plaintiff would suggest, with the filing of a lawsuit concerning his own employment

termination addressed to the judicial branch of government. The present lawsuit does not involve any "public debate" in a public forum. The First Amendment protects an employee's speech only when it involves "matters of public concern." <u>Connick</u>, 461 U.S. at 143 (explaining that not all employee speech is protected, and that only speech that relates to issues "of political, social, or other concern to the community" is protected by the First Amendment). The defendants are entitled to judgment as a matter of law on plaintiff's First Amendment claim under § 1983. Fed.R.Civ.P. 56(a). Plaintiff's objections regarding this claim are without merit.

Additionally, the Magistrate Judge recommended that, absent any sort of a constitutional violation, the individual defendants (Drs. Degen and Stone) would also be entitled to qualified immunity in their individual capacities. See <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009). In order to allege a violation of a right, it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). In other words, "in the light of pre-existing law, the unlawfulness must be apparent." <u>Id</u>. Here, it is not clear that a reasonable official would understand that the termination of an at-will employee under the circumstances of this case would violate the First Amendment. Hence, Drs. Degen and Stone would be entitled to qualified immunity on this claim.

## IV. Conclusion

Plaintiff's state claims are subject to dismissal on the basis of Eleventh Amendment immunity and state law, O.R.C. § 9.86. With respect to his FMLA interference claim, plaintiff has pointed to sufficient evidence suggesting that he may

have been demoted for reasons related to his FMLA leave. With respect to his FMLA retaliation claim, plaintiff has pointed to sufficient evidence of "pretext" to withstand summary judgment. Additionally, there are genuine disputes of fact whether Dr. Degen's investigation of the stated reasons for termination was sufficient to give protection under the "honest belief" rule. Plaintiff's FMLA claims may proceed to trial. With respect to plaintiff's First Amendment claim, plaintiff has not shown he was terminated for raising issues of public concern in his letter and lawsuit rather than workplace grievances regarding his own employment.

Accordingly, the Court will <u>GRANT in part</u> and <u>DENY in part</u> the defendants' "Motion for Summary Judgment" (doc. no. 46) as follows:

1. summary judgment is <u>denied</u> as to Count One (the FMLA claim) as to the defendant University of Cincinnati, but <u>granted</u> to the individual defendants, Drs. Stone and Degen, who are <u>dismissed</u> under this claim;

2. summary judgment is <u>granted</u> as to Count Two (the First Amendment claim), and such claim is hereby dismissed; and

3. Counts Three and Four (the state law claims) are dismissed without prejudice for lack of jurisdiction.

This case will proceed to trial as previously scheduled.

IT IS SO ORDERED.

<u>     s/Herman J. Weber     </u>
Herman J. Weber, Senior Judge
United States District Court
